IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) Robert Young, on behalf of himself and all others similarly situated, | ) ) ) | |
| v. | ) ) | Case No.: 17-CIV-101-RAW-TLW |
| (1) ETMC System, a Texas nonprofit corporation; | ) ) ) | |
| (2) ETMC Services,  a Texas for-profit corporation; | ) ) ) | JURY TRIAL DEMANDED |
| (3) PARAMEDICS PLUS, L.L.C., a Texas limited liability company; | ) ) ) | |
| (4) EMERGENCY MEDICAL SERVICES AUTHORITY, an Oklahoma public trust; | ) ) ) | |
| (5) HERBERT STEVEN WILLIAMSON, an Individual; | ) ) ) | |
| (6) KENT TORRENCE, an Individual; | ) ) | |
| (7) RON SCHWARTZ, an Individual; and | ) ) | |
| (8) ELMER ELLIS, an Individual | ) | |

## AMENDED COMPLAINT

The Plaintiff, Robert Young, on behalf of himself and all others similarly situated, hereby alleges and states the following:

## PARITES

1.      The Plaintiff, Robert Young, is an individual resident of the State of Oklahoma and resides in the City of Tulsa, Oklahoma, and has at all times relevant hereto been a participant in the Emergency Medical Services Authority ("EMSA") TotalCare program, and has paid the monthly fee on his monthly utility bill.

2.      ETMC System is a Texas nonprofit corporation headquartered in Tyler, Texas, that owns and operates a number of health care facilities, including an acute-care hospital located in Tyler, Texas. ETMC System transacted business in the Northern District of Oklahoma during the relevant time frame of this action. ETMC System may be served through its registered agent in the State of Oklahoma, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

3.      ETMC Services is a Texas for-profit corporation headquartered in Tyler, Texas, that is affiliated with ETMC System. ETMC Services transacted business in the Northern District of Oklahoma during the relevant time frame of this action. ETMC Services may be served through its registered agent, Elmer G. Ellis, at 1000 South Beckham Avenue, Tyler, Texas 75701.

4.      Paramedics Plus is a Texas limited liability company and for-profit subsidiary of ETMC. Paramedics Plus's principal office is located in Tyler, Texas, and Paramedics Plus transacted business in the Northern District of Oklahoma during the relevant time frame of this action. Paramedics Plus may be served through its registered agent, Elmer G. Ellis, at 1000 South Beckham Avenue, Tyler, Texas 75701.

5.      Emergency Medical Services Authority ("EMSA") is an Oklahoma public trust established pursuant to 60 O.S. § § 176 *et seq.,*as amended, created by trust indenture on December 1,1977. An Amended and Restated Trust Indenture became effective March 1, 1990. EMSA is operated by public employees and provides, through the services of a contractor, emergency and non-emergency transport services in and around Tulsa and Oklahoma City. EMSA transacted business in the Northern District of Oklahoma during the relevant time frame of this action. EMSA may be served at 1111 Classen Drive, Oklahoma City, Oklahoma 73103, 1417 N. Lansing, Tulsa, Oklahoma 74106, and through its beneficiaries, Oklahoma City and the City of Tulsa.

6.      Herbert Stephen Williamson is an individual resident of Oklahoma. Williamson transacted business in the Northern District of Oklahoma during the relevant timeframe of this action.

7.      Kent Torrence is an individual resident of Oklahoma. Torrence has transacted business in the Northern District of Oklahoma during the relevant timeframe of this action..

8.      Ronald J. Schwartz is an individual resident of Texas. Schwartz has transacted business in the Northern District of Oklahoma during the relevant timeframe of this action.

9.      Elmer G. Ellis is an individual resident of Texas. Ellis has transacted business in the Northern District of Oklahoma during the relevant timeframe of this action.

## JURISDICTION AND VENUE

10.     This action is brought as a class action pursuant to Rule 23, Federal Rules of Civil Procedure ("FRCivP"), the Class Action Fairness Act, 28 U.S.C. Section 1332 ("CAFA"), and contains counts brought pursuant to 18 U.S.C.A. Section 1962, et seq.

11.     Subject matter jurisdiction arises under Rule 23, FRCivP, CAFA, and 18 U.S.C.A. Section 1962, et seq. The amount in controversy is in excess of $5,000,000.00, exclusive of interest, costs and attorney fees.

12.     Personal jurisdiction is based on diversity of citizenship, CAFA and 18 U.S.C.A. Section 1962, et seq.

13.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) and (c) since one or more of the Defendants transact business in this district and/or one or more of the acts at issue occurred in this district.

**INTRODUCTION**

14.     In or around 1998, EMSA and several of its officers entered into a criminal enterprise, one of the objectives of which was a conspiracy with ETMC[1]. The objective of the conspiracy was to induce EMSA to award a contract for ambulance services to ETMC, without going through an otherwise – required open bidding process, thereby assuring that ETMC would be awarded a very lucrative contract. The conspiracy was successful. EMSA was able to convince its Board to circumvent the open bid process and award the contract to ETMC. The benefit to ETMC from the contract with EMSA was that ETMC would then be the sole source provider for ambulance services to the cities of Tulsa and Oklahoma City, and to bill for those services at inflated prices, for services not actually required or rendered, and to alter the character of certain ambulance runs from non-emergency to emergency, thus increasing the payments made for each of such runs. The contract which was the object of the conspiracy was supposed to have been, and indeed proved to be, hugely successful financially for ETMC. In fact, as will be described more fully below, ETMC made tens of millions of dollars profit on this contract.

15.     As part of this successful conspiracy of having the ambulance contract awarded to ETMC without complying with the "open bid" requirement otherwise applicable to EMSA contract awards, ETMC "kicked-back" to EMSA some portion of the illegal profits accruing to ETMC from the contract. The ETMC "kickbacks" to EMSA began and continued for a number of years, with EMSA and individual members of the Kickback Enterprise and conspiracy eventually receiving over $20 million in these illegal "kickbacks" from ETMC.

16.     The money paid for the ambulance services supposedly rendered by ETMC and Paramedics Plus, which was also the source of money for the illegal "kickbacks," came from five

---

[1] ETMC Services and ETMC System are, at times, collectively referred to herein as "ETMC".

sources: federal Medicare funds; state and federal Medicaid funds; private insurance payments; private payors; and, payments made by citizens/residents of Tulsa and Oklahoma City for what was essentially an insurance contract for ambulance services.

17.     The criminal enterprise, the attendant conspiracy, and the results of the conspiracy were finally disclosed through a Qui Tam complaint filed by an ex-officer of Paramedics Plus.  As a result of the Qui Tam complaint, the federal government and the states of Oklahoma and Texas have sued ETMC, EMSA, some of their affiliates and some of their controlling persons to recover the illegal payments made as a direct result of the Kickback Enterprise and conspiracy, and the contract which was the objective of that conspiracy.   The states of Oklahoma and Texas have filed similar actions to recover funds expended by those states as a direct result of the "kickback" conspiracy and the kickback contract that was the object of that conspiracy.  This action is brought by the residents of Tulsa, Oklahoma City, and other participating municipalities to recover overpayments which Plaintiff and other Class Members made to EMSA, and thus ETMC, and which were used at least in part to fund the Kickback Enterprise and illegal "kickbacks" paid in furtherance of the illegal conspiracy.

18.     The remaining allegations are intended to provide the necessary depth and detail needed to support the various Counts and Claims for Relief. The numbered paragraphs which follow detail some, but probably not all, of the many ways in which the criminal enterprise and conspiracy complained of was carried into effect, the effects of that conspiracy, the manner in which Defendants profited from the conspiracy, the "kickbacks" made in furtherance of the conspiracy, and, the manner in which Plaintiff, and each member of the class, has been damaged as a direct result of the illegal criminal enterprise and conspiracy entered into and carried into effect by the Defendants, and each of them.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

19.     Defendants Paramedics Plus and ETMC are affiliated entities governed and controlled by the same individuals and whose operations are inextricably intertwined. Specifically, these defendants share common management, finances, control, and supervision. Paramedics Plus and ETMC acted in concert to facilitate and cause the submission of false claims to the United States and various state governments. Paramedics Plus and ETMC are jointly and severally liable for the actions of the other. Paramedics Plus and ETMC are also vicariously liable for the actions of their executives such as Ron Schwartz and Elmer Ellis, other employees, and agents.

20.     Defendant EMSA is similarly vicariously liable for the actions of its President, Herbert Stephen Williamson, Chief Financial Officer, Kent Torrence, and its other employees and agents.

21.     In forming what is hereinafter described as the "Kickback Enterprise" and in accepting kickbacks and bribes from other defendants and members of the Kickback Enterprise, Williamson and Torrence acted outside the scope of their employment with EMSA.  Neither Williamson nor Torrence can assert that they were acting within the scope of their employment with EMSA in performing criminal acts.  Governmental Tort Claims Act, Section 153.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action pursuant to Rule 23, FRCivP, as a class action for himself and as representative of and for, and on behalf of, all other similarly situated persons ("Class Members").[2] The Class Members are defined as participants in EMSA's Utility Fee Program (sometimes referred to as the "EMSA TotalCare Program") from 2008 through 2013. All class members were detrimentally affected and lost property as a result of Defendants' fraud, conspiracy

---

[2] Unless specifically stated, "Plaintiff" also refers to "Class Members."

to defraud, and violations of other State and Federal laws which Defendants engaged in in furtherance of their criminal enterprise and conspiracy to defraud, as alleged herein.[3]

23.     Upon information and belief, the Class Members are numerous, reside in diverse cities in Oklahoma and that the joinder of all Class Members is impracticable.

24.     Upon information and belief, the individual loss and potential recovery of each Class Member is such that each is precluded from individually litigating the claims asserted herein by reason of the burdens, costs and expenses involved and that many Class Members will never have their day in court unless this action proceeds as a class action.

25.     This action is governed by Federal law.

26.     There are substantial questions of law and fact common to the claims of the Class Members against defendants.

27.     The claims of Class Plaintiff are typical of the claims of each and all of the Class Members and are based upon and arise out of the identical facts concerning the conduct of the defendants.

28.     Plaintiff is situated to, capable of, and will fairly and adequately represent the interests of the Class Members. Because of the similarity and identity of claims of Plaintiff and the individual Class Members, the successful assertion of Plaintiff's claims herein will result in the determination of law and facts adequate to prove the liability of defendants to each Class Member.

29.     The prosecution of separate actions by the individual Class Members, even if possible, would create a risk of inconsistent or varying adjudications or verdicts that may establish incompatible standards of conduct for defendants.

30.     Defendants' acts alleged herein are applicable to all Class Members, making the

---

[3] The Class excludes officers or employees of Defendants and any person or entity whom Plaintiff's counsel is prohibited from representing under the Oklahoma Rules of Professional Conduct.

relief sought generally applicable to all of the Class Members.

31.     The questions of law and fact common to the claims of the Class against defendants are also common to the claims of each of the Class Members against the defendants, and predominate over questions, if any, affecting individual Class Members.

32.     A class action is superior to other available methods and necessary for the fair and efficient adjudication of the matters alleged herein.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

33.     Beginning in 1998 and ending in 2013, Defendants Williamson and Torrence, together with the then-president of ETMC, Anthony Myers (now deceased), conspired to form a criminal enterprise, the purpose of which was to enrich themselves and their controlled entities through an illegal kickback scheme.  The criminal scheme was intended and designed to control the award of a lucrative public ambulance contract in the State of Oklahoma (the "Kickback Enterprise"). To carry the criminal scheme into effect, the Kickback Enterprise used otherwise legitimate companies the individual defendants owned or controlled-Paramedics Plus and its parent company ETMC (both Texas entities) to pay to EMSA (a public trust established by a trust indenture under Oklahoma law) over $20 million to obtain, and then retain, that ambulance services contract with EMSA. In addition to paying over $20 million in cash kickbacks to EMSA, the Kickback Enterprise caused the corporate defendants Paramedics Plus and ETMC to also pay bribes and kickbacks to EMSA employees in the form of cash and gifts. Defendants purposefully omitted the terms of the kickback arrangement from all written contracts between EMSA and Paramedics Plus, and concealed the kickbacks from the public and the EMSA Board of Trustees. The illegal kickback scheme, and all its associated payments, were concealed and could not have been discovered prior the date the Qui Tam complaint was opened.

## FORMATION OF THE KICKBACK ENTERPRISE AND THE CONSPIRACY

34.     EMSA, established in 1977, operates a Public Utility Model of ambulance services in Tulsa and Oklahoma City. EMSA describes itself as Oklahoma's largest provider of pre-hospital emergency care. A public entity operated by public employees, EMSA owns or leases ambulances, but does not employ drivers, emergency medical technicians (EMTs), or paramedics. Instead, EMSA contracts with a private contractor for drivers, EMTs, paramedics, and other personnel that actually perform health care services. EMSA, using software implemented by Frank Gresh who served as both EMSA and Paramedic's Plus Chief Operating Officer simultaneously, then bills Medicare, Oklahoma Medicaid, private payors, and patients for the services provided by its contractor's personnel.

35.     EMSA operates as a middleman between Oklahoma citizens and the contracted provider of ambulance services. In that role, EMSA controls the selection of the private contractor whose employees transport, treat, and care for Oklahoma residents, many of whom are beneficiaries of Medicare and the Oklahoma Medicaid program.

36.     From 1994 through 1998, EMSA's contractor was American Medical Response (AMR), one of the largest for-profit ambulance companies in the United States. In 1997, EMSA issued a Request for Proposal ("RFP") to determine whether another contractor could provide the same or better services as AMR at a lower cost. Public entities are often legally required to issue RFPs to help ensure (1) the appropriate use of taxpayer funds, (2) open and transparent contracting processes, and (3) fair competition for public contracts.  EMSA was subject to this requirement for open bidding, but conspired with the Kickback Enterprise and Paramedics Plus to avoid public bidding, insure that Paramedics Plus would be awarded this lucrative contract, and in return, secure a series of kickbacks and bribe payments from Paramedics Plus.  This conspiracy to effect the

9

fraud that resulted, the actions taken to implement the fraudulent scheme, as described herein, caused EMSA, ETMC, Paramedics Plus, and various individuals named as defendants herein, to violate several Federal laws, specifically, the anti-kickback statute and the wire fraud statutes. These violations of Federal law constitute the requisite predicate acts to support Plaintiff's RICO claim, Count IV hereof.

37.     In or around 1997, EMSA's President, H. Stephen Williamson, attended an ambulance industry conference in Florida. At some point, Williamson met Anthony Myers, an executive at ETMC, a not-for-profit health care system headquartered in Tyler, Texas.[4] At the time, ETMC operated an acute-care hospital in Tyler and also ran its own ambulance business in Texas under the ETMC name. Myers and Williamson formed the Kickback Enterprise, which then devised a scheme by which ETMC would create a new, for-profit company to displace AMR as EMSA's ambulance services contractor in Oklahoma. In furtherance of the criminal enterprise, the new ETMC-created company would kick back part of its proceeds to EMSA, Williamson, and Torrence, and to bribe certain officials. This meeting, and the consequent actions taken by both Williamson and Myers in formation of the Kickback Enterprise and in design and furtherance of the conspiracy to defraud that begun at the meeting, are all predicate acts in violation of the RICO statute, 18 USCA Section 1962.

**ACTS IN FURTHERANCE OF THE ENTERPRISE AND THE CONSPIRACY**

38.     In furtherance of the purpose and intent of the Kickback Enterprise, on June 22, 1998, ETMC formed a new Texas limited liability company, "Paramedics Plus, LLC," an entity with no history of providing ambulance services in Oklahoma or anywhere else. Among

---

[4] Anthony Myers is not named as a defendant in this suit because he passed away in 2012.

Paramedics Plus's original four managers were Myers and Elmer Ellis, ETMC's President and Chief Executive Officer.

39.     On or around September 23, 1998, EMSA announced that it was dropping AMR and awarding its multi-million-dollar ambulance services contract to Paramedics Plus, the brand-new company from Tyler, Texas that had never provided ambulance services before.

## THE ILLEGAL "KICKBACK CONTRACT"

40.     EMSA was in precarious finances from 1994 until 1998, when Williamson met with Anthony Myers, an ETMC executive, at an industry conference in Florida, where the two formed the Kickback Enterprise and conspired to concoct the scheme by which EMSA and ETMC illegally defrauded Plaintiff and others of over $40 Million between the years 1998 and 2013. The scheme to defraud was simple: instead of using the public bid process to award the ambulance contract, as required by law, Williamson, for EMSA, worked around it and saw that the ambulance contract was awarded to ETMC and Paramedics Plus (an ETCM subsidiary formed solely to be the entity which would provide the paramedic personnel to staff EMSA's ambulances). After the contract was awarded, the new, ETMC-controlled company would kickback part of its illegal gains to EMSA, and pay for bribes to certain officials and others. All of the Defendants would thus share in the illegal profits of the Kickback Enterprise.

41.     Paramedics Plus was formed by the Kickback Enterprise to provide a vehicle to carry out the illegal scheme planned by the Kickback Enterprise. Paramedics Plus did not even exist when, on June 19, 1998, ETMC submitted a bid, on behalf of Paramedics Plus, for the EMSA contract. Paramedics Plus did not file its Texas Articles of Organization until June 22, 1998. The initial managers for Paramedics Plus included Myers and Elmer Ellis, then the President and CEO of ETMC.

42.     In connection with the formation of the Kickback Enterprise and its June 19, 1998 bid, ETMC and the Kickback Enterprise secretly agreed to transfer illegal kickbacks to EMSA that the conspirators would later describe as a "profit cap." ETMC and its officers secretly agreed with EMSA and Williamson that Paramedics Plus would "kickback" to EMSA any profits over 12% (on information and belief, 12% of gross revenues). The Enterprise further concocted the plan to use EMSA's tax exempt status as a non-profit entity to make substantial purchases on behalf of Paramedics Plus and later deduced from its monthly payments. The conspirators purposefully and intentionally did not reduce to writing this fraudulent scheme.

43.     At an EMSA Board of Trustees meeting on July 29, 1998, Williamson acted to ensure that the lucrative ambulance contract was awarded, without the bidding process, to Paramedics Plus. The meeting minutes do not reflect any disclosure by Williamson or anyone else of the kickback arrangement to EMSA's Board. That same day, EMSA awarded its Oklahoma ambulance services contract—worth more than $100 million—to Paramedics Plus, a company that at the time had no authority to conduct business in Oklahoma.

44.     On October 26, 1998, EMSA and Paramedics Plus executed a contract awarding Paramedics Plus the exclusive right to provide ambulance services in EMSA's Oklahoma territory for a five-year period. Notably, EMSA's Request for Proposal and the contract were silent as to any "rebate" payments, "profit cap" payments, or similar kickbacks. However, the contract explicitly misrepresents that "[n]o prior agreement or understandings, verbal or otherwise of the parties, or their agents, shall be valid or enforceable unless embodied in the Contract, the RFP or the Proposal."

45.     As additional and continuing acts in furtherance of the criminal Kickback Enterprise and conspiracy, on March 26, 2003, EMSA and Paramedics Plus modified the 1998

ambulance services contract. The conspirators amended the payment schedule, which altered the rates payable by EMSA to Paramedics Plus. EMSA then extended the contract five years, to October 31, 2008. This modification also noted that EMSA "shall have the option to extend the term of the contract an additional five (5) years (i.e., from November 1, 2008 through October 31, 2013)." The renewed contract also, and notably, omitted any reference to the kickback arrangement or any "profit cap."

46.     As additional and continuing acts in furtherance of the criminal Kickback Enterprise and conspiracy, after the first modification dated March 26, 2003, EMSA and Paramedics Plus amended the ambulance services contract four more times between 2008 and 2013. These amendments and extensions evidence the continuing nature of the criminal enterprise, because each demonstrates a pattern of continuing criminal activity, and an intent by the Kickback Enterprise to continue that activity indefinitely into the future.   None of these modifications identified any kickback, bribe, "rebate," "gain sharing," or "profit splitting" provision, formula, or similar terms. In fact, each of the modifications explicitly states that there were "no unwritten oral agreements between the parties." This representation was false, knowingly false when made, and intended by the conspirators to hide the illegal kickback provisions of the contract and modifications.

47.     ETMC and Paramedics Plus went on to pay over $20 million in cash to EMSA, Williamson, and other EMSA employees between 2006 and 2013. These payments were kickbacks from the proceeds of the criminal enterprise, the intent and objective of which was to obtain and retain the multi-million-dollar EMSA ambulance contract, the award of which Williamson influenced and directed.   Each of these payments, some of which are set forth in Paragraph 52 hereof, constituted separate predicate criminal acts that had the same purpose (to effect the

13

kickback conspiracy), the results (insured that the kickback conspiracy succeeded and continued), many of the same participants (the named Defendants), all had the same victims (various government agencies, insurance companies, Plaintiff and Class Members) and methods of commission (mail and wire fraud in the transfer of the kickbacks and bribes). These predicate criminal acts are interrelated by distinguishing characteristics (kickbacks and bribes) and are not isolated events because the kickbacks and amendments to the kickback contract occurred over a period of years.

48.     Although ETMC, Paramedics Plus, Myers, EMSA, and Williamson agreed that kickbacks would be made, they never reduced to writing (except, as explained below, when deceiving a state auditor) the terms as to how to calculate the kickbacks, when to pay the kickbacks, who would pay taxes on the kickbacks, and so forth. Instead, ETMC and Paramedics Plus paid kickbacks to EMSA and Williamson on a haphazard schedule. The kickbacks were rarely paid the same month of the year, often taking the form of "advances" or "interest-free" loans to EMSA paid at Williamson's request. Torrence, in his position as CFO of EMSA, then discretely hid the payments within the financial reports presented to the Board of Trustees.

### ACTUAL "KICKBACKS" TO EMSA AND OTHER DEFENDANTS

49.     In order to keep the contract and the attendant revenue, over the next 15 years, the Kickback Enterprise continued to cause ETMC and Paramedics Plus to pay kickbacks to EMSA, its officers and designees, and engaged in other illegal activity at the request of EMSA officials. By way of non-exclusive examples, Paramedics Plus or ETMC paid for certain costs incurred by EMSA, made political contributions to Oklahoma politicians at Williamson's behest, paid millions of dollars in bribes to EMSA and Williamson at key moments, including leading up to and on the

date of a critical contract extension in 2008, gave EMSA interest-free cash payments and loans, and showered EMSA employees, including Williamson, with expensive gifts.

50.     Paragraph 52 of this Complaint contains a chart showing the "kickbacks" made to EMSA and other defendants, such as Torrence.  Note that not all the "kickback" payments are to an account number listed only as "EMSA."  Those listed as being to a different account number were likely to individuals or private accounts.

51.     From 1998 through 2013, ETMC and Paramedics Plus received approximately $45 million in profit under the EMSA contract. ETMC and Paramedics Plus kicked back nearly half of this profit (over $20 million) to EMSA—all under the concealed, illegal kickback arrangement designed to ensure that Paramedics Plus kept the lucrative ambulance services contract.

52.     Further, the kickbacks were often for large, rounded amounts. Paramedics Plus employees usually submitted check requests to ETMC on ETMC System check requisition forms, and ETMC employees would then authorize the payments. For example, ETMC and Paramedics Plus issued checks or wire transfers to EMSA in the following amounts, many of which were suspiciously round numbers for a purported arms-length "rebate" based on a percentage of gross revenues:

| | |
|---|---|
| March 7, 2008: | $500,000.00 |
| October 30, 2008: | $1,025,000.00 |
| January 28, 2009: | $1,303,250.00 |
| December 04, 2009: | $874,000.00 |
| April 6, 2010: | $300,000.00 |
| July 2, 2010: | $1,000,000.00 |
| December 6, 2010: | $2,906,995.00 |
| January 4, 2011: | $25,000.00 |
| March 4, 2011: | $400,000.00 |
| July 18, 2011: | $2,000,000.00 |
| October 6, 2011: | $1,500,000.00 |
| November 21, 2011: | $1,210,633.83 |
| July 27, 2012: | $2,000,000.00 |
| January 24, 2013: | $1,089,077.00 |

ETMC and Paramedics Plus also issued checks or wire transfers to EMSA-Torrence, using a different Vendor ID than the ones previously referenced for the following amounts:

| | |
|---|---|
| October 04, 2006: | $700,000.00 |
| February 22, 2007: | $297,200.00 |
| March 16, 2007: | $102,198.00 |
| December 05, 2007: | $1,035,500.00 |
| September 15, 2009: | $1,000,000.00 |

53.     As explained below, many of these payments were made in advance of major contracting events (such as the 2008 renewal) or as gratuities for favorable steps taken by EMSA and Williamson.

54.     Importantly, these cash payments were made to EMSA and Torrence from a variety of ETMC and Paramedics Plus accounts. For instance, internal Paramedics Plus documents show that Paramedics Plus reimbursed ETMC Tyler Hospital $2,906,995.00 on December 6, 2010 for the "wire made to EMSA." Further, ETMC System directly wired $2,000,000.00 to EMSA on July 18, 2011 and another $1,210,633.83 on November 21, 2011. Noteworthy is the fact that only the $2,000,000 payment appears on those listed in the Government's table in Paragraph 52, above. These "wire transfers" are each separate predicate criminal acts, evidencing support for Plaintiff's RICO claims.  And, these wire transfers were made over a period of years, again evidencing the continuing nature of the criminal activity, and the likelihood that the criminal enterprise would continue into the indefinite future.

55.     In addition to the kickbacks made by wire or check, ETMC and Paramedics Plus often paid EMSA's bills directly or simply bought expensive items and services for EMSA. For example, ETMC and Paramedics Plus paid for certain construction, paving, data systems, consulting, marketing, and technology services provided to EMSA. Upon information and belief, these payments were made to friends or businesses that EMSA wanted to benefit from the kickback

16

conspiracy. Frank Gresh, serving as CIO of both Paramedics Plus and EMSA, was integral in deciding which contractors EMSA used for data system purposes, and these are the same data systems he pushed to other cities Paramedics Plus offered their services.

56.    By having Paramedics Plus directly pay contractors such as Connelly Paving Co., In Motion Technology, and Zoll Data Systems, EMSA again circumvented its own public bidding obligations, constituting yet another predicate criminal act, and again evidencing the continuing nature of the Kickback Enterprise and conspiracy.   Circumventing its public bidding obligation also allowed EMSA "pay off" the owners of these companies by making sure these companies got the work on these projects. Specifically, effective as early as 2007, EMSA was required by written policy to place all expenditures exceeding $25,000.00 out for public bid. Williamson and Torrence simply used ETMC and Paramedics Plus to bypass the EMSA Board's required approval of certain large expenditures. Paramedics Plus directly paid EMSA's contractors hundreds of thousands of dollars to keep Williamson satisfied and to retain the ambulance services contract. These payments were not itemized in EMSA's audited financial records. Upon information and belief, the financial records of these companies will expose the defendants derived payment or benefit from each of these companies.

57.    ETMC and Paramedics Plus paid at least $50,000.00 for Williamson's travel expenses which were unrelated to the kickback contract. All of these payments were made in furtherance of the Kickback Enterprise and conspiracy to obtain and keep the ambulance services contract: on October 30, 2008, the same day Williamson signed a five-year extension with Paramedics Plus, ETMC and Paramedics Plus paid EMSA $25,000.00 for Williamson's "travel."

58.    Defendants will likely claim the existence of a "rebate" arrangement whereby the money flowed back to the Tulsa and Oklahoma City communities. However, ETMC and

Paramedics Plus "booked" the $25,000.00 "travel" payment "against the rebate," which means Williamson personally benefitted from money Defendants claim was owed to EMSA to benefit local communities.

59.     Thereafter, on January 4, 2011, ETMC and Paramedics Plus, under the oversight of Schwartz and Ellis,  paid EMSA another $25,000.00 for Williamson's travel. Neither of the two $25,000.00 payments for Williamson's travel was disclosed to EMSA's Board of Trustees. Upon information and belief, there were more payments made for Williamson's benefit that were not disclosed to the Board or to the public.

60.     In addition to the $50,000.00 for Williamson's travel, Williamson and other EMSA employees received personal gifts as bribes. In December 2010, ETMC and Paramedics Plus bought Williamson steaks valued at $1,334.70. These gifts were not disclosed to the EMSA Board or to the public.

61.     In addition, ETMC and Paramedics Plus frequently paid for spa visits or parties for Williamson and other EMSA employees.

62.     ETMC and Paramedics Plus also made political contributions (bribes) to Oklahoma politicians at EMSA and Williamson's request.   These payments were made to Oklahoma politicians, including city councilmen and mayoral candidates who determined whether EMSA continued as the public ambulance services middleman in Tulsa and Oklahoma City. Upon information and belief, Williamson exercise control and improperly influenced defendants to make political contributions.

63.     On occasion, Williamson asked that political contribution checks be issued by ETMC and Paramedics Plus and sent directly to EMSA. For maximum political effect, Williamson or other EMSA employees would then physically present the check to the preferred candidate.

64.     Williamson exerted influence for contribution in January and April of 2011. The results of Williamson's improper contribution led to a gag order being issues against EMSA's most vocal competition in Tulsa—the Tulsa Fire Department. Pursuant to the gag order, employees of the Tulsa Fire Department were prohibited from taking part in local campaigns or using their positions to influence the outcome of local political campaigns while EMSA ran funds though Paramedics Plus on their behalf.

65.     During the same periods that the Fire Department was prohibited from engaging in political activities, EMSA (itself a public trust) and other Defendants poured donations into the campaign coffers of local politicians, including another $1,000.00 donation to a mayor on June 2, 2011, soon after he issued the above executive orders.

66.     The Kickback Enterprise received a direct benefit from the bribes paid by ETMC and Paramedics Plus, as established in a January 17, 2011 email from EMSA's Public Information Officer, Lara O'Leary, to Paramedics Plus's Stephen Dean, which explains the purpose of the "contributions:"

> Stephen [meaning Williamson], [a] man named Ed Shadid is running against Sam Bowman for the ward 2 city council spot in March. I would like for P+ to contribute to his campaign. I'll be going to his campaign speech on the 25th. He wants to meet with me to talk about EMSA. I am available for that and would like to be able to offer a donation. Can we talk Tuesday about the best way to handle this? [sic] Incumbant [sic] Sam Bowman has been somewhat of a thorn for us for some time…. [sic] as he talks of Fire's [meaning the Tulsa Fire Department] wonderful ways. He has voted against us in the past.

67.     ETMC and Paramedics Plus contributed $1,000.00 to Bowman's opponent and former EMSA Board of Trustees member Ed Shadid. Mr. Shadid ripped up the check, and, on September 15, 2011, Mr. Shadid forwarded specific questions to EMSA's Lara O'Leary and Williamson. Mr. Shadid asked, "Which members of the OKC City Council have received

campaign contributions from EMSA and/or Paramedics Plus[?] What is the amount of those donations?" After an internal back-and-forth massaging the language of the response, Williamson answered:

> EMSA does not make contributions to political campaigns, including city council campaigns. EMSA does not possess information that would allow it to respond on behalf of Paramedics Plus with regard to its business activities nor has EMSA researched the individual contribution reports of any of the current or past city council candidates.

Williamson's response was untrue and purposefully evasive, intended to hide the illegal and unsavory reality that ETMC and Paramedics Plus were part of an entrenched and continuing criminal enterprise. Williamson did in fact have information that would allow him to respond because he had personally asked for political donations from ETMC and Paramedics Plus and delivered some of the contribution checks to local politicians. Williamson knew the conduct was unlawful and deliberately concealed it.

68.   These contributions were unlawful kickbacks and bribes designed to obtain, approve and extend the illegal kickback contract between EMSA and ETMC and Paramedics Plus, thus allowing Defendants to steal over $40 Million from the participating cities and municipalities. The contributions were not disclosed on EMSA's audited financial records.

69.   In September 2010, internal correspondence evidences that Myers halted spending on most items, including training, until the new budget year because he promised a kickback of $4.8 million and had available only at $4.6 million. In other words, Myers manipulated costs to affect the kickback objective of the enterprise and conspiracy.

70.   ETMC and Paramedics Plus booked the kickbacks as, among other things, "public relations" expenses. The money used for the kickbacks remained in the control of ETMC and Paramedics Plus, and Myers and other executives such as Schwartz and Ellis, determined that the

money should be used to pay kickbacks and bribes to obtain and retain the contract, rather than to train schedulers or retain paramedics.

## ETMC PROFITS AND THE CONTINUING ENTERPRISE AND CONSPIRACY

71.     Beginning in 2006, Paramedics Plus's annual revenues under the EMSA contract began to climb substantially. From 2006 through 2013, Paramedics Plus's revenues under the EMSA contract steadily climbed from approximately $30 million in 2006 to over $56 million in 2013. ETMC and Paramedics Plus's profits from the conspiracy and kickback contract also climbed, and so did the amount of the kickbacks.

72.     The kickback payments climbed from approximately $1.3 million in 2006 to approximately $5.5 million in 2011.

73.     ETMC and Paramedics Plus records evidence that ETMC and Paramedics Plus were not "sharing" a small portion of their profits. Rather, the kickbacks paid to EMSA often exceeded 40% of Paramedics Plus's total profits on the contract—at least until, as explained below, ETMC and Paramedics Plus learned in late 2012 or early 2013 that Paramedics Plus was at risk of losing the kickback contract.

74.     The kickback contract between EMSA and Paramedics Plus was to expire in October 2008.  EMSA controlled the award of a five-year extension through 2013.

75.     In 2007, EMSA was supposed to have a new Request for Proposal ("RFP") prepared to place the ambulance contract out for bid. However, to stop the bid from being issued, the Kickback enterprise elected to increase the amount of the kickbacks so as to make the new contract appear more profitable and at a lower cost.

76.     In particular, in September or October 2007, Paramedics Plus presented a "Confidential" presentation to Williamson entitled "EMSA Operating Economics Presentation."

The written proposal in the PowerPoint explicitly stated that Paramedics Plus was proposing to "modify 2008 rates to improve EMSA cash flows and operating results in exchange for sole source negotiation of contract extension on identical terms and operating standards." (Emphasis added). Paramedics Plus proceeded to present a menu of "Pricing Options" that Williamson, as President of EMSA, could choose from. Notably absent from the presentation were quality of care metrics, such as response times and performance statistics.

77.     On November 28, 2007, Williamson made a presentation to the EMSA Board of Trustees regarding the renewal of the Paramedics Plus contract. The meeting minutes are silent as to any mention of a "profit cap," higher kickbacks, more "rebates," or any similar arrangement. Williamson, operating as a member of the criminal enterprise and in furtherance of the objectives of the enterprise and the conspiracy, recommended the extension of the contract, and the Board approved it. Within a week, ETMC and Paramedics Plus paid an illegal kickback to EMSA and Williamson in the amount of $1,035,500.00. ETMC and Paramedics Plus claim they cannot locate a copy of this check or any bank records or correspondence concerning this payment.

78.     In November 2007, even though the existing kickback contract ran through October 2008, ETMC and Paramedics Plus began paying higher kickbacks to EMSA for a contract extension that would go into effect a year later. As evidence of the confidential conspiracy, Defendants again failed to memorialize any of these terms in a written agreement.

79.     Having received the approval of the Board to negotiate an extension with Paramedics Plus, Williamson exploited the situation, resulting in more bribes from ETMC and Paramedics Plus. On March 12, 2008, Myers sent Williamson a check payable to EMSA in the amount of $500,000.00, and attempted to paint the kickback as an "advance against the excess profits" anticipated for the year. Myers explained that, if "we do not have excess profits exceeding

22

this amount, the amount of the advance greater than the excess profit will revert to an interest free loan." However, as noted above, Myers, in furtherance of the Kickback enterprise and conspiracy, manipulated costs to ensure robust kickback payments and made no effort to seek repayment of this money. In addition, the calculation of "excess profits" could not be questioned or scrutinized as it was nowhere in any written agreement between the parties.

80.     On October 28, 2008, Williamson signed the Second Modification to the EMSA kickback contract. Even though Paramedics Plus had not yet signed the modification, ETMC and Paramedics Plus issued two checks payable to EMSA on the same day Williamson signed—the same day Williamson ensured Paramedics Plus five more years of multi-million-dollar revenues. The first check was for $1,000,000.00 as a "prepayment" of "rebates" for the 2008 to 2009 contract year that had not yet started. The second check (again, cut the same day Williamson executed the extension) was for $25,000.00 for Williamson's "travel."

81.     Myers signed the Second Modification on October 31, 2008. The kickback contract remained silent about any of these advances, kickbacks, bribes, "rebates," or "profit sharing."

82.     The 2007 EMSA RFP was never issued for public bid, and companies such as AMR did not have an opportunity to compete for the contract.

83.     A draft of the 2007 EMSA RFP dated September 30, 2007, while never issued to the public, was exchanged back and forth between EMSA and Paramedics Plus employees. Remarkably, Page 53 of the draft RFP made the following an event of default:

> Payment by the contractor or any of the contractor's employees of any bribe, kickback or consideration of any kind to any federal, state, or local public official or consultant in exchange for any consideration whatsoever, when such consideration could reasonably be construed to be a violation of any federal, state or local law.

Bribery and kickbacks were exactly what ETMC and Paramedics Plus were doing.

## CONCEALING THE CONSPIRACY CONTINUES

84.     Around this time, Myers was advised that the extension of the kickback contract would be a good opportunity to put the "profit cap" arrangement in writing. Myers preferred for the kickback arrangement to remain unwritten. Myers signed the Second Modification on October 31, 2008, which contained no mention of any advances, "rebates," or "profit sharing."

85.     Defendants had referred to the illegal kickback arrangement as a "profit cap," in hopes of giving it an air of legitimacy. Paramedics Plus later claimed in its marketing materials that it was giving money back to the communities by paying cash to the public entities that award it contracts.

86.     For over a decade, Defendants never reduced the supposed illegal "profit cap" contract to writing, and they never formalized when the kickback "payments" would be made or how they would be calculated. Instead, ETMC and Paramedics Plus simply transferred huge sums of money to EMSA (often in conspicuously rounded amounts) whenever needed to further the objectives of the conspiracy, which were to enrich the Defendants.  Williamson even instructed ETMC and Paramedics Plus to pay Oklahoma politicians, noting that the payments would be booked "against the profit cap." Defendants set up a slush fund to conceal the extent of the kickbacks from EMSA's Board of Trustees. Williamson too deceived a Board member when asked about Paramedics Plus's political contributions to Oklahoma politicians.

87.     Following unfavorable media reports in 2012 regarding the relationship between EMSA and Paramedics Plus, EMSA's Board of Trustees requested that an auditor from the State of Oklahoma examine the allegations of misconduct. Anticipating the auditor's arrival in September 2012, Williamson asked EMSA's law firm to prepare a ghostwritten letter, placed on Paramedics Plus's letterhead.  The fraudulent purpose of this "ghosted" letter was to "paper-up"

the illegal kickback contract that had existed for years and thus attempt to hide the illegal kickback activity from State auditors. The letter was purposefully undated, contained false information, and was hastily placed in EMSA's records before the audit began. Paramedics Plus's President Ron Schwartz apparently signed the letter, endorsing its false representations.

88.     EMSA never "booked" the kickback payments in its accounting records. Instead, and except where actual checks were issued, EMSA subtracted the amount of the payments made from the amount it paid Paramedics Plus, which EMSA then booked to show "cost savings." In other words, if EMSA paid Paramedics Plus $50 million one year but was paid kickbacks of $5 million, EMSA would simply and deceptively show payments to Paramedics Plus of $45 million.

89.     Importantly, Paramedics Plus's own documents purporting to track profit percentage do not equal the amount of kickbacks paid. And, where Paramedics Plus's own internal correspondence shows an estimated 2011 or 2012 kickback of less than $1 million, actual documents prove Paramedics Plus transferred to EMSA over $5 million in 2011 and approximately $2 million in 2012.

## THE FEDERAL QUI TAM COMPLAINT IS OPENED

90.     On or about January 06, 2017, a Qui Tam Complaint that had been filed in the Eastern District of Texas was unsealed.  The Qui Tam Complaint contained allegations and proof that defendants had engaged in an illegal kickback conspiracy designed to ensure that Paramedics Plus was the entity to be awarded the EMSA contract for ambulance services to the Plaintiff's and others.

91.     On or about January 6, 2017 the Federal Government elected to proceed with the prosecution of the Qui Tam Complaint in the Federal District Court for the Eastern District of Texas, Case No. 4:14-CV-203.  The Federal Complaint contains the violations that constitute the

predicate criminal act or actions required for the application of the Racketeer Influenced Corrupt Organization Act, 18 U.S.C.A. Section 1962, et seq., specifically the intentional conspiracy to violate and the subsequent violation of the Federal Anti-Kickback Statute, U.S.C. §1320a-7b (the "AKS").

92.     On or about February 6, 2017, the state of Oklahoma filed a similar Complaint against the same defendants, making largely the same claims, and supported by the same evidence as was made available in the original Qui Tam Complaint.

## THE HARM RESULTING FROM THE CONSPIRACY TO DEFRAUD

93.     In 2007, before the kickbacks were substantial, Williamson was worried about EMSA's income and profitability, and was unsure how he could keep running the facility without some sort of illegal funding. The City of Tulsa was in a budget crisis and could no longer provide the subsidies to EMSA and had told Williamson to find an additional way to fund EMSA.

94.     Williamson approached the City of Tulsa with a plan formulated by himself, and Torrence the CFO, to fund EMSA. Williamson's plan was to enroll every household in the city of Tulsa in a new program called TotalCare. For a price of $3.64 a month collected via monthly water bills issued from the City, EMSA would have an extra $4-5 million in income, per year. Williamson made certain false commitments to the City of Tulsa concerning how the program would benefit the citizens of the City, and how they would be charged.  The City essentially ended up with an "optional" program that was not advertised to the general public and gave the public 30 days to opt out of the program, or be stuck for the next year paying the fee.   Over 95% of Tulsa households were enrolled in the program in its first year. The program promised individuals would never pay "any out of pocket expenses" for an emergency ambulance ride, regardless of insurance coverage.  This method of securing payment for ambulance services through the kickback contract

was the means to the objective of the enterprise-to make illegal profits from the money paid by the Plaintiff and Class Members.  This was a sham program designed to pass the funds to Paramedics Plus which then returned the funds to EMSA and others in the form of illegal kickbacks and bribes.

95.    In theory, the fee was supposed to cover emergency ambulance transport for any individual living in a covered household. If the individual had insurance of any type, no further payment would be required—the funds would cover all co-pays, deductibles, etc. If insurance denied coverage, the City would reimburse EMSA for the trip and provide the full cost of the emergency transport to EMSA, which would then be remitted to Paramedics Plus. If the emergency transport was partially covered by insurance, the remaining balance would be sent to the City and the City would reimburse EMSA for the remaining portion.

96.    Plaintiff and Class Members pay a monthly fee for a contract with EMSA which provides that EMSA would make no charge for emergency ambulance service which was over and above that part of the EMSA ambulance fee paid by private insurance and/or federal insurance schemes. This is essentially an insurance contract. The sum paid by each plaintiff was approximately $45 per year. For convenience, the sums paid by Plaintiff were included on Plaintiff's monthly utility bills, sent from the various participating cities and municipalities. However, the cities and municipalities are merely "pass-through entities" for Plaintiff's payments. Historically, Plaintiff's payments which are received by the various cities and municipalities have either been paid over directly to EMSA, or, have been paid to EMSA upon being invoiced by EMSA. The cities and municipalities retained none of these payments.

97.     Between the years 2007 and 2013, the "claim period," Plaintiff has paid approximately $56,000,000.00 to EMSA.

98.    Plaintiff has been damaged in two ways by Defendant's illegal conduct. First, a

portion of the monies Plaintiff paid to EMSA, and which were transferred by EMSA to Paramedics

Plus, were used to fund illegal kickbacks and bribes that were paid by Paramedics Plus directly to

officers of EMSA, for travel expenses and spa treatments, and for direct political contributions

requested to be made by EMSA and Williamson. *See*, chart in Paragraph 52 hereof.

99.    As in the chart in Paragraph 52, all payments not made to the EMSA account

number were made directly to defendants or co-conspirators, or used to allow EMSA to avoid open

bidding on projects which EMSA's officers wanted to direct to their friends or business associates.

Notably, the Government's chart shows payments to Defendant Torrence of over $3 Million, who

had a vendor ID number different from that of EMSA. From the Government's chart, these direct

kickbacks and other payments totaled approximately $3.8 Million, all or a material portion of

which was paid from the payments made by Plaintiff.

100.    Second, Plaintiff incurred actual damages as a result of being knowingly,

fraudulently and systematically overcharged for the contract benefits EMSA has represented that

Plaintiff would receive.  The overcharge is explained as follows.  Paramedics Plus was paid some

$280 million per year under the illegal kickback contract. When the illegal kickback contract was

finally let for public bid, Paramedics Plus' competitor, AMR, bid the cost at only some $240

million per year, over $40 million per year ___*less*___ then Paramedics Plus was paid under its illegal

kickback contract. Accordingly, the actual cost of the services Plaintiff paid for was some 15%

less than EMSA charged Plaintiff. Because EMSA is a not-for-profit public trust, but for the

Kickback enterprise and the illegal conspiracy to carry the intent of the Kickback enterprise into

effect, the contract would have been let for public bid and Plaintiff would have been charged, and

paid, approximately 15% less per year than under the illegal kickback contract. The illegal

kickback conspiracy thus directly resulted in an overcharge to Plaintiff of some $9 per year per

28

plaintiff, for some 400-600,000 Class Members, for six years. That total is approximately $27,000,000 in actual overcharges to the Class for which certification is sought. Therefore, Plaintiff suffered actual damages because Plaintiff were overbilled by EMSA each year for participation in the various city and municipality ambulance programs.

**ALLEGATIONS AS TO NAMED PLAINTIFF**

101.    Robert Young has been a resident of the City of Tulsa during all relevant time periods and has paid the TotalCare Fee on his monthly water bill.

**COUNT I**<br>**FRAUD**

102.    Plaintiff incorporates by reference all prior allegations set forth above.

103.    Count I is for fraud and arises under the common law of Oklahoma.

104.    Defendants, and each of them, committed fraud upon Plaintiff and Class Members by intentionally misrepresenting that the cost of the services provided by ETMC and Paramedics Plus to EMSA, and therefore to Plaintiff, was higher than it actually was, thereby causing Plaintiff and Class Members to pay more than each should have been required to pay had the contract between ETMC and EMSA been arms-length and not an illegal kickback scheme.

105.    Defendants, and each of them, intentionally misrepresented to Plaintiff and Class Members that the charges being paid for emergency ambulance services were being paid to Paramedics Plus pursuant to a legal contract, and not an illegal kickback scheme.

106.    Throughout the Claim Period, Defendants, and each of them, made at least one false material misrepresentation to Plaintiff through solicitations of Plaintiff to pay to participate in the EMSA TotalCare Program; which misrepresentation was made as a positive assertion which was known by Defendants to be false when made; which misrepresentation was made with the intention that Plaintiff would act on it and participate in the EMSA TotalCare Program; and which Plaintiff

29

and Class Members relied on to their detriment in enrolling (and continuing to enroll) in the EMSA

TotalCare Program; and which caused Plaintiff and Class Members harm and actual damages.

107.    Plaintiff and Class Members did not know, and could not have known of the illegal

acts of the defendants herein alleged until the *Qui Tam* Complaint had been unsealed, in January

2017.

108.    Each Class Member has suffered actual damages because the illegal and fraudulent

Kickback Enterprise alleged herein directly caused the cost of the EMSA TotalCare Program

charged to each Class Member to be higher than it otherwise would have been.

## COUNT II
## CONSTRUCTIVE FRAUD

109.    Plaintiff incorporates by reference all prior allegations set forth above.

110.    Count II is for constructive fraud and arises under the common law of Oklahoma

111.    Defendants EMSA, Williamson, and Torrence, committed constructive fraud upon

Plaintiff and Class Members by failing to disclose the actual cost of services provided by ETMC

and Paramedics Plus to EMSA, and therefore to Plaintiff, was higher than it actually was, thereby

causing Plaintiff and Class Members to pay more than necessary. Had the actual price of ETMC

and Paramedics Plus services been utilized in calculation of the amount of TotalCare monthly

payments, the amount of Plaintiffs' monthly payments for TotalCare would have been lower.

112.    Defendants had a duty to disclose the material fact, the actual cost of services

provided by Paramedics Plus and ETMC, which was known to them.

113.    Plaintiff and Class Members were not in a position to discovery the fact and the

fact was peculiarly within Defendants' knowledge.

114.     Throughout the Claim Period, Defendants EMSA, Williamson and Torrence, failed to disclose the material fact by overcharging for the TotalCare fee and blaming the surging prices of ambulance services for the increase in the fees.

115.     Plaintiff and Class Members did not know, and could not have known of the illegal acts of the Defendants herein alleged until the *Qui Tam* Complaint had been unsealed in January of 2017.

116.     Each Class Member has suffered actual damages because of the failure to disclose the actual cost of services provided by ETMC and Paramedics Plus to EMSA thus each Class Member was charged more than it would have been otherwise.

## COUNT III
## CONSPIRACY TO DEFRAUD

117.     Plaintiff incorporates by reference all prior allegations set forth above.

118.     Count II is for conspiracy to defraud and arises under the common law of Oklahoma.

119.     Defendants Williamson, Myers, Torrence, EMSA and ETMC conspired together to do an unlawful act, that is, violate the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b, as well as the Federal mail and wire fraud statutes.

120.     One of the independently unlawful purposes of the conspiracy was to obtain money from Plaintiff, and others, by illegally inflating costs by use through the illegal Kickback Enterprise, as described hereinbefore.

121.     Plaintiff and each Class Member has suffered actual damages because the illegal and fraudulent Kickback Enterprise alleged herein directly caused the cost of the EMSA TotalCare Program charged to each Class Member to be higher than it otherwise would have been.

## COUNT IV
## VIOLATION OF THE RACKETEER INFLUENCED
## CORRUPT ORGANIZATIONS ACT

122.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

123.    This claim is brought on behalf of the class against Defendants for actual damages, treble damages, and other relief under 18 U.S.C. § 1 964   for   violations of 18 U.S.C. § 1962, et seq.

124.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

125.    Plaintiff and the Class Members are each "persons," as that term is defined in 18 U.S.C. § 196 1(3), who were injured in their business or property as a result  of Defendant's wrongful  conduct.

### A.    The Kickback Enterprise

126.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

127.    The named defendants and certain of their controlling persons formed just such an association-in-fact enterprise, sometimes referred to in this Complaint as the Kickback Enterprise. The Kickback Enterprise consists of (a) Paramedics Plus, including its employees and agents; (b) ETMC, including its employees and agents; (c) ETMC Services, including its employees and agents, (d) EMSA, including its employees and agents; and (e) the individual Defendants, including Williamson and Torrence.

32

128.   The Kickback Enterprise is an ongoing and continuing  business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose:  to secure an exclusive ambulance contract for Paramedics Plus to provide emergency ambulance services to cities and municipalities in Oklahoma and other states for than it costs Paramedics Plus to actually provide the services, to raise the price to consumers, such as Plaintiff, and others for the purpose of providing increased profits to ETMC and Paramedics Plus, and illegal kickbacks to EMSA, Williamson and Torrence. In other words, the enterprise established prices for the provision of emergency ambulance services with the purpose of providing ETMC, ETMC Services, Paramedics Plus, EMSA, Williamson and Torrence money to distribute to themselves through kickbacks, to invest in other criminal enterprises (such as those similar kickback schemes with other entities such as EMSA, in other states), and for bribes of public officials.

129.   To accomplish this purpose, the Kickback Enterprise periodically and systematically inflated the costs of emergency services to the cities and municipalities and represented – either affirmatively or through half-truths and omissions – to consumers, including Plaintiff and the Class Members, EMSA's Board, the general public, health care payers, that the contract pricing in the Paramedics Plus contract with EMSA fairly and accurately reflected the actual cost of providing emergency medical transport to the cities and municipalities subject to the EMSA/Paramedics Plus contracts. The Kickback Enterprise concealed from consumers, including Plaintiff and the Class Members, the EMSA Board, public, health care payers, the existence and amount of kickbacks ETMC, ETMC Services and Paramedics Plus gave to EMSA, Williamson and Torrence. The Kickback Enterprise also concealed the purpose of these kickbacks: the difference between the contract price and the real costs of providing emergency medical transport

resulted in increased profits for ETMC, ETMC Services, Paramedics Plus, and EMSA, which profits were used for illegal kickbacks, bribes, and to further and extend the criminal enterprise into other states and cities.  These kickbacks served to ensure that EMSA would continue to insure that the contract for emergency ambulance transport would be awarded to Paramedics Plus, thus insuring and increasing the profitability of ETMC, ETMC Services and Paramedics Plus, and thus the criminal enterprise.  By securing the kickback contract, the Kickback Enterprise ensured that all of the emergency medical transports in the geographic area covered by the Kickback contract would be provided by Paramedics Plus.  This conspiracy translated into higher profits for EMSA, ETMC, ETMC Services, and more money for Williamson and Torrence.

130.    The persons engaged in the Kickback Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Williamson, Torrence, and the controlling persons of ETMC. There is regular communication between ETMC, ETMC Services, Paramedics Plus, EMSA, Williamson and Torrence in which information is shared.   Typically, as demonstrated in the previous paragraphs of this Complaint, these communications occurred, and continue to occur, through the use of the wires and the mail in which ETMC and its coconspirators share information regarding kickbacks, future pitches for new contracts, kickback rates, kickback amounts, and bribes. ETMC and its coconspirators functioned as a continuing unit for the purposes of implementing the kickback scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

131.    At all relevant times, EMSA was aware of ETMC's and Paramedics Plus' conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. EMSA struck kickback deals with ETMC, ETMC Services and Paramedics Plus to conceal the true price

of providing emergency ambulance transport and its profit from the inflated prices.  EMSA represented to the EMSA Board, and to the public, that the contract it negotiated and recommended for approval saved the citizens of the cities and municipalities subject to the kickback contract (including Plaintiff and members of the class) money on their cost to participate in EMSA's program for emergency medical transport.  But EMSA knew that the kickback contract artificially inflated the cost of medical transport for consumers, because the kickback contract price was falsely inflated by the kickback conspiracy. But for the Kickback Enterprise' s unlawful fraud, EMSA would have had the incentive to disclose the deception by ETMC, ETMC Services and Paramedics Plus, thereby forcing competition on real price. By failing to disclose this information, EMSA perpetuated the Kickback Enterprise's scheme, and reaped substantial profits for itself, Williamson, Torrence and other members of the Kickback Enterprise.

132.    EMSA participated in the conduct of the Kickback Enterprise, sharing the common purpose of inflating the price for EMSA's ambulance transport program, through  a pattern of racketeering activity within the  meaning  of 18 U.S.C. § 1961(1) and  (5), which includes  multiple instances of mail fraud in violation of 18 U.S.C.  § 1341, and multiple instances of wire fraud  in violation of  18 U.S.C. § 1343.  EMSA knowingly made material misstatements, or knowing chose not to disclose material information, to EMSA's Board, health care payers, plan members, and the general public in furtherance of  the fraudulent scheme regarding:

a)    The actual cost of providing emergency medical transport;

b)    The extent to which the actual cost of providing emergency medical transport departed from the artificially-inflated kickback contract price;

c)    The existence of the kickbacks and bribes; and,

d)    The extent to which the kickback scheme would force Plaintiff and Class

Members to incur additional expenses for their participation in the EMSA ambulance program.

133.    ETMC, ETMC Services and Paramedics Plus alone could not have accomplished the purpose of the Kickback Enterprise without the assistance of EMSA, Williamson and Torrence. For ETMC and its affiliates to profit from the scheme, EMSA needed to convince EMSA's Board and the citizens of the cities and municipalities subject to the Kickback contract, Plaintiff and Class Members, that the contract actually reflected the legitimate cost of the service. And EMSA did so through misrepresentations:  EMSA told its Board, citizens, and city governments that the cost of the program as reflected in the kickback contract was legitimate and accurate. However, EMSA at all times knew that the contract price that EMSA misrepresented as accurate was artificially inflated. It was the result of a deliberate scheme to create large profits without disclosing the actual costs of the program for emergency medical transport services.   Without these misrepresentations, the Kickback Enterprise could not have achieved its common purpose.

134.    The impact of the Kickback Enterprise's scheme are still in place.

135.    The foregoing paragraphs of this Complaint evidenced that ETMC, ETMC Services, Paramedics Plus, EMSA, Williamson and Torrence were each willing participants in the Kickback Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, i.e., through Defendants' artificial inflation of the actual costs of providing a medical transport program to the cities and municipalities,  coupled with ETMC's and EMSA's creation of substantial kickbacks and actual bribes, and EMSA's misstatements to the public that those contracts and the resulting prices benefitted consumers like Plaintiff and the class.

**B.      Conduct of the Kickback Enterprise**

136.    During the class period, ETMC (and its affiliates and controlling persons) exerted control over the Kickback Enterprise and participated in the operation or management of the affairs of the Kickback Enterprise, directly or indirectly, in the following ways:

a)    ETMC prepared and published the proposed contract pricing model that EMSA presented to its Board;

b)    ETMC periodically increased the cost model that EMSA presented to its Board; [5]

c)    ETMC made substantial kickbacks and bribes to EMSA, Williamson, Torrence and others, representing illegal profits, in exchange for EMSA providing ETMC and its affiliates sole bidder status for the medical transport contract;

d)    ETMC intended that EMSA would (and did) distribute through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that the Paramedics Plus contract saved consumers like Plaintiff and Class Members money on their participation in EMSA's medical transport program.

137.    The scheme had a hierarchical decision-making structure that was headed by ETMC and its controlling persons.  ETMC and its officers controlled the kickback contract price, and paid kickbacks and bribes to EMSA, Williamson, Torrence and others in exchange ETMC and its affiliates receiving the contract for medical transport services to Oklahoma cities and municipalities.

---

[5] *See, e.g.*, In re Lupron Mktg. & Sales Practices litig., 295F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in- fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

138.    EMSA, Williamson and Torrence also participated in the conduct of the affairs of the Kickback Enterprise, directly or indirectly, in the following ways:

a)    EMSA, Williamson and Torrence promised to, and did, insure that Paramedics Plus was the sole bidder for, and thus assured of getting the kickback contract;

b)    EMSA distributed through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that the kickback contract would save money for and benefit consumers like Plaintiff and Class Members by saving money on their ambulance transports; and

c)    EMSA, Williamson and Torrence concealed the existence or amount  of the kickbacks-including those given to Williamson, Torrence, and bribes paid to them and others-  to further the fraudulent pricing scheme.

139.    The scheme devised and implemented by ETMC, its controlling persons and other members of the Kickback Enterprise, amounted to a common course of conduct intended to (a) secure Sole bidder and sole source status for Paramedics Plus; (b) entice the relevant cities and municipalities to participate in the kickback contract; and thereby (c) secure payment for transport pursuant to the fraudulent scheme adopted by the Kickback Enterprise conspirators.

C.    **The Pattern of Racketeering Activity**

140.    ETMC and its affiliates conducted and participated in the conduct of the affairs of the Kickback Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, 18 U.S.C. § 1343,  relating to wire fraud, and the Federal Anti-Kickback Statute, U.S.C. §1320a-7b.  The pattern of racketeering activity by the Kickback Enterprise likely involved thousands of separate instances of use of the U.S. mail or

38

interstate wire facilities in furtherance of the unlawful kickback scheme. Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which ETMC and EMSA, in concert with the other defendants, intended to defraud Plaintiff, members of the class, and other known and intended victims.

141.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and members of the class. The Defendants calculated and intentionally crafted the kickback scheme to ensure their own profits, without regard to the effect such behavior had on Plaintiff and members of the class who would be over-billed for participation in the medical transport program.  In designing and implementing the scheme, at all times Defendants were cognizant of the fact that citizens, including Plaintiff, relied on the integrity of a public trust and the statutes regarding the public bidding process in establishing accurate, fair and correct prices for program participation

142.    By intentionally and artificially inflating the medical transport program costs, and then subsequently failing to disclose price manipulation, Defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

143.    Defendants racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiff and members of the class. Each separate use of the U.S. mail and/or interstate wire facilities employed by Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff and members of the class.  Defendants

have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Kickback Enterprise.

144.    The pattern of racketeering activity alleged herein and the Kickback Enterprise are separate and distinct from each other. Likewise, ETMC is distinct from the Kickback Enterprise.

**D.    The Kickback Enterprise's Use of the U.S. Mail and Interstate Wire Facilities**

145.    The Kickback Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and payment from EMSA to ETMC and Paramedics Plus; ETMC Services and Paramedics Plus to EMSA, Williamson and Torrence of kickbacks and bribes; and transmission of false or incomplete statements intended to mislead the governments of the cities and municipalities, and the EMSA Board regarding the real cost of providing medical transport services, and existence and amount of the kickbacks and bribes.

146.    During the class period, the Kickback Enterprise 's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, and funds by the U.S. mail and interstate wire facilities. The nature and pervasiveness of the EMSA program pricing fraud scheme, which was orchestrated out of the corporate headquarters of ETMC and EMSA, necessarily  required those headquarters to communicate directly and frequently by U.S.  mail and interstate wire facilities.

147.    Many of the precise dates of the Kickback Enterprise' s uses of the U.S. mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Defendant's books and records. Indeed, an essential part of the successful operation of the Kickback Enterprise alleged herein depended upon secrecy.

However, Plaintiff and the actions filed by the Attorney General of Oklahoma and the US Attorney for the Eastern District of Texas describe in substantial detail the occasions on which the RICO predicate acts of violations of the Anti-Kickback Statute, mail fraud, and wire fraud occurred, and how those acts were in furtherance of the scheme and Enterprise.

148.    The pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a)    Marketing materials about the proposed cost of the kickback contract and its price, which ETMC and its officers sent from their Texas offices to Williamson, Torrence and EMSA in Oklahoma;

b)    Written communications between ETMC, EMSA and its controlling persons concerning the amount of kickbacks, various bribes, and various payments for personal bribes to Williamson;

c)    Written representations and telephone calls between ETMC entites and EMSA, Williamson and Torrence concerning the cost of the kickback contract, what ETMC and Paramedics Plus would have to do to be awarded sole bidder status, and therefore be awarded the kickback contract;

d)    Written communications and telephone calls between the Texas enterprise conspirators and the Oklahoma enterprise conspirators regarding the timing, amount and payment of kickbacks.

e)    Upon information and belief, hundreds of emails between the coconspirators agreeing to or effectuating the implementation of the pricing fraud scheme;

f)      Written and oral communications directed to State Government agencies that fraudulently misrepresented the cost of providing the medical transport services; the existence and amount of the kickbacks; and the true costs of providing medical transport services, that were designed to conceal the scheme, deter investigations into the costs and contract terms, or forestall changes to the kickback contract; and,

g)      Receipts of increased profits sent through U.S. mail and Interstate wire facilities- the wrongful proceeds of the scheme.

149.   In addition to the above-referenced RICO predicate acts, EMSA distributed publications through the U.S. mail to Plaintiff and Class Members, and in those publications, claimed that the costs of the EMSA program were low and determined by adherence to the open-bid process required by Oklahoma law.

### E.      Damages Caused by the EMSA Program Pricing Fraud

150.   ETMC and the Kickback Enterprise's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiff and the Class Members to be injured in their business or property because Plaintiff and Class Members have paid inflated out-of-pocket expenses for the EMSA program. These damages are more fully described in Paragraphs 91-98 hereof.

151.   The amount of Plaintiff's and Class Members monthly payments is based on the EMSA program's inflated cost, inflated wholly as a direct result of the Kickback Enterprise's illegal activities in violation of the Anti-Kickback Statute, mail and wire fraud.

152.   Plaintiff's injuries, and those of the Class Members, were proximately caused by the Kickback Enterprise's racketeering activity. But for the violations of law, fraud and conspiracy

made by the Kickback Enterprise and the other named defendants, Plaintiff and others similarly situated would have paid substantially less for their participating in the EMSA program.

153.    Plaintiff's injuries were directly caused by the Kickback Enterprise's racketeering activity. Other parties, primarily the Medicare and Medicaid programs were also directly damaged by the Kickback Enterprise's racketeering activity, but did not suffer the same overcharges alleged in this Complaint.

154.    And although the Kickback Enterprise was effectuated to give Paramedics Plus a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Paramedic Plus's competitors.

155.    Plaintiff and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from the Kickback Enterprise's fraudulent scheme.

156.    By virtue of these violations of 18 U.S.C § 1962(C), Defendants are liable to Plaintiff for three times the damages Plaintiff and Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT IV**
**Violation of Plaintiffs' Constitutional Rights by Defendant EMSA**
**(42 U.S.C. §1983)**

157.   Defendant EMSA's policies, practices, procedures and customs resulted in a deprivation of Plaintiffs' well established Constitutional rights under the Fifth and Fourteenth Amendments.

158.   Defendant EMSA's inadequate policies, practices and procedures oversight of its officers and employees resulted in a deprivation of Plaintiffs' well established Constitutional rights under the Fifth and Fourteenth Amendments.

159.   Defendant EMSA's failure to supervise its officers and employees amounts to deliberate indifference.

160.   Defendant EMSA made a conscious choice by failing to adequately supervise its officers and employees which resulted in a deprivation of Plaintiffs' well established Constitutional rights under the Fifth and Fourteenth Amendments.

161.   Defendant EMSA's policy, practices, customs and procedures are nonexistent or wholly inadequate given the great power, authority and deference given to its officers and/or employees.

162.   Defendant EMSA knew or should have known that Defendants Williamson and/or Torrence were likely to engage in the acts set forth above.

163.   Defendant EMSA authorized or ratified the actions of Defendants Williamson and/or Torrence

164.   As a result of Defendant EMSA's actions, policies, procedures and customs, Plaintiffs suffered damages.

## COUNT V
### Violation of Plaintiffs Constitutional Rights by Defendant Williamson
### (42 U.S.C. §1983)

165.    Defendant Williamson is the Chief Executive Officer of Defendant EMSA.

166.    As Chief Executive Officer of Defendant EMSA, Defendant Williamson acted under color of state law.

167.    Defendant Williamson's actions were in violation of the policies and procedures of Defendant EMSA.

168.    Defendant Williamson's actions led to a violation of Plaintiffs' well established Constitutional rights under the Fifth and Fourteenth Amendments.

169.    Defendant Williamson's actions are in violation of 42 U.S.C. §1983.

## COUNT VI
### Violation of Plaintiffs Constitutional Rights by Defendant Torrence
### (42 U.S.C. §1983)

170.    Defendant Torrence is the Chief Financial Officer of Defendant EMSA.

171.    As Chief Financial Officer of Defendant EMSA, Defendant Torrence acted under color of state law.

172.    Defendant Torrence's actions were in violation of the policies and procedures of Defendant EMSA.

173.    Defendant Torrence's actions led to a violation of Plaintiffs' well established Constitutional rights under the Fifth and Fourteenth Amendments.

174.    Defendant Torrence's actions are in violation of 42 U.S.C. §1983.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class Members, pray for judgment against Defendants, jointly and severally, in favor of themselves  as to their  respective  claims alleged

above and for the Class Members for the following relief: (1) money damages, the amount of which is presently unknown, but is believed to be in excess of $10,000,000.00, exclusive of interest and costs; (2) attorney fees as provided by law; (3) actual and exemplary damages in favor of Plaintiff and Class Members and against Defendants, jointly and severally;  (4) such other relief, either at law or in equity, to which Plaintiff and Class Members show they are  entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims that may be tried before a jury.

DATED: April  24, 2017.

Respectfully submitted,

_____*/s/ Bob L. Latham*_____

Bob L. Latham, OBA No. 15799
Marcus N. Ratcliff, OBA No. 19201
Brandy L. Inman, OBA No. 22187
Heather M. Kinsaul, OBA No. 32579
Latham, Wagner, Steele & Lehman, P.C.
10441 S Regal Blvd, Suite 200
Tulsa, OK 74133
Tel:  (918) 970-2000
Fax: (918) 970-2002
blatham@lwsl-law.com
mratcliff@lwsl-law.com
binman@lwsl-law.com
hkinsaul@lwsl-law.com

<and>

Robert K. Pezold, OBA No. 7100
1502 S. Boulder Avenue, Suite 15A
Tulsa, Oklahoma 74119
Telephone:  918-625-0003
rkpezold@tokenex.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF MAILING</u>

I hereby certify that on April 24, 2017, a true and correct copy of the above and foregoing instrument was served via CM-ECF and via first class mail, postage prepaid upon the following:

Michael Burrage via CM-ECF
WHITTEN BURRAGE
<and>
Joel L. Wohlgemuth via CM-ECF
Ryan A. Ray via CM-ECF
NORMAN WOHLGEMUTH CHANDERS
JETER BARNETT & RAY, P.C.
*Attorneys for Defendants*
*East Texas Medical Center Regional*
*Healthcare Systems, Inc.; East Texas Medical*
*Center Regional Health Services, Inc.; and*
*Paramedics Plus, LLC*

Dan S. Folluo via CM-ECF
Lauren M. Marciano via CM-ECF
*Attorneys for Defendant*
*Kent Torrence*

Kristopher E. Koepsel,
RIGGS ABNEY
502 W. 6th Street
Tulsa, Oklahoma 74119-3161
*Attorney for Defendant*
*Emergency Medical Services Authority*

John J. Carwile
McDONALD, McCANN, METCALF & CARWILE, LLP
15 E. Fifth Street, Suite 1400
Tulsa, Oklahoma 74103
*Attorney for Defendant*
*Herbert Stephen Williamson*

*Bob L. Latham*